IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | REPORT AND RECOMMENDATION |
| v. | |
| JUVENTINO PLANCARTE, | 22-cr-64-wmc |
| Defendant. | |

---

**REPORT**

Before the court is defendant Juventino Plancarte's motion to suppress evidence. Dkt. 16. For the reasons stated below, I am recommending that the court deny this motion.

The grand jury has charged defendant Plancarte with committing two drug trafficking crimes on January 20, 2022: possessing methamphetamine with intent to distribute it and running a drug house. Dkt. 2. Plancarte has moved to suppress all evidence derived from a traffic stop and search that day of a vehicle in which was a passenger. Dkt. 16. Plancarte's main point is that there was no probable cause to support the car search because the drug detecting dog's olfaction palate included hemp, a legal substance; therefore, the police could not know if the dog actually was alerting to a controlled substance. *Id.* at 4-7; Br. in Supp., dkt. 32 at 2-3.

The government responds that the dog search passes muster under the Fourth Amendment, and that the totality of circumstance–*including* the dog's alert–provided probable cause to search the car. In any event, contends the government, the police relied in good faith on existing law that deems an alert by a trained and certified drug dog to provide probable cause. Gov. Resp., dkt. 33. In reply, Plancarte doubles down, contending that the continued use by law enforcement agencies across the nation of drug-detecting dogs who alert to the odor of hemp is a "deliberate, systemic violation" of the Fourth Amendment, which is "precisely the type of

case where the exclusionary rule is warranted." Reply, dkt. 35, at 6. Accordingly, says Plancarte, any police officer who relies on an alert by a drug dog who has not been trained off of marijuana has knowingly and recklessly violated the law, thereby forfeiting reliance on the good faith doctrine. *Id.* at 8-9.

Setting aside Plancarte's blindered hyperbole, he makes a valid point: the use of drug dogs in the age of legalized marijuana and hemp products must be reexamined. This, however, isn't going to help Plancarte, because existing law–upon which the police were entitled to rely– does not support his argument for suppression. Plancarte's contention that this existing law is so out-of-date as to be obviously null-and-void is DOA. Further, even taking into account the fact that the dog used here had not been trained off of hemp, the totality of circumstances provided probable cause to search the car.

## FACTS

On November 7, 2022, the court held an evidentiary hearing, at which both sides presented witnesses and offered exhibits. *See* Tr., dkt. 31. Having considered the exhibits, and having heard and seen the witnesses testify and having judged their credibility, I find the following facts:

**(1) The vehicle stop**

James Mancuso is a drug investigator for the La Crosse Police Department, where he has worked for 17 years, nine of them in his current position; prior to that, he was a patrol officer. Inv. Mancuso has extensive specialized training and experience in controlled substance

investigations, both at the street level and higher in the drug trafficking hierarchy. He has investigated the gamut of controlled substances, including marijuana and methamphetamine, among others. In his nine years as drug investigator, he has run informants or engaged in surveillance over 400 times, not counting his drug-related work as a patrol officer. Based on this training and experience, Inv. Mancuso recognizes particular activity and behavior as indica of a drug transaction.

In the last few years, the majority of drug cases investigated by Inv. Mancuso and LCPD have involved methamphetamine, fentanyl and cocaine; not may have involved marijuana. The majority of drug traffickers that Inv. Mancuso has encountered in the La Crosse area have been dealing in multiple drugs at once. Inv. Mancuso does not normally find a person selling only marijuana; usually, it would be marijuana with methamphetamine, or marijuana with fentanyl.

In December 2021 and January 2022, community reports and complaints, coupled with law enforcement investigations and arrests, led the police to focus their drug interdiction efforts to six or seven hotels within a three-block radius on the north side of La Crosse. In particular, the 1800 block of Rose Street had three hotels in a row (along with their parking lots) that were well-known to the police as locations where people sold and used drugs. So, this is where law enforcement focused its efforts. During this interdiction, the police noted that often the drug users and dealers came into the area driving rental cars or vehicles with out-of-state license plates, then did their business either in the parking lots or inside one of the hotels. During this interdiction in this area at this time, the police never encountered individuals who possessed only legal substances such as CBD oils or hemp.

On Thursday afternoon, January 20, 2022, law enforcement officers from various agencies, including the Wisconsin State Patrol and LCPD, were conducting interdiction in this area. Inv. Mancuso was parked at 1800 Rose Street conducting surveillance. A state trooper running radar nearby on I-90 at the Minnesota/Wisconsin border reported a suspicious inbound vehicle to the La Crosse police: according to the trooper, when this vehicle drove past his position, the driver immediately slowed down to 62 MPH, even though he wasn't speeding to begin with. The trooper saw the driver's face as he passed: he reported that the driver looked like he had just seen a ghost. The trooper provided identifying information about the vehicle: it was a 2014 Buick Verano sedan with Minnesota license plate GFH890. A registration check revealed that the car was registered to an owner living in Inner Grove Heights, a suburb of Minneapolis/St. Paul/West St. Paul, which Inv. Mancuso knew to be a source city for methamphetamine.

A short time later, Inv. Mancuso saw the Buick drive past. He noticed extremely dark tint on the driver's side windows and on the read window. Based on his years as a patrol officer, he knew that this tint was so dark as to violate both Wisconsin and Minnesota traffic regulations. Observing through the car's open passenger windows, Inv. Mancuso saw a man driving and a man in the front passenger seat. He watched the Buick pull into the parking lot of the AmercInn on Rose Street and park near the southeast entrance door. No one got out; the car sat for 30 minutes. No one approached the vehicle during this time. The car then retraced its route through the parking lot and drove through the nearby KFC parking lot in a manner that led Inv. Mancuso to surmise that the occupants were looking for someone. The Buick parked at the KFC and three men got out. The backseat passenger was Juventino Plancarte. They tried

to enter the KFC, but the lobby was closed due to COVID. The men re-entered their car, ordered food at the drive-through window, then parked in the KFC lot for about 45 to 60 minutes. They then drove back to the AmericInn parking lot and circled the lot with the passenger side windows down part of the time (notwithstanding an outdoor temperature of 5º F), apparently checking out the parked cars. To Inv. Mancuso, it looked as if they were trying to find the people they were supposed to meet. They then parked in the hotel's north side parking lot and sat in the car for another 45 to 60 minutes. No one got out of the Buick and no one approached it. After about an hour, the Buick left the parking lot and headed back to the Interstate.

Based on his training and experience as a drug investigator, Inv. Mancuso believed that the men were engaged in a drug transaction. He directed officers to perform a traffic stop on the Buick for the tinted window violation, and he asked that a drug-detecting dog be ready to walk around the car during the traffic stop. Officers performed the traffic stop after the Buick had reentered I-90, westbound to Minnesota. It was between 5:00 and 5:30 p.m. Two LCPD officers approached the car, confirmed that the window tint was too dark, and made contact with the occupants once the windows were lowered. Officer Nathan Lewis asked front-seat passenger Emanuel Florez some background questions; Florez gave inconsistent answers and appeared unusually nervous, fidgeting with times and taking "deep, shallow breaths." Dkt. 16-1 at 10.

**(2) The Alert by Loki, one of LCPD's Drug Detection Dogs**

LCPD Officer Aaron Westpfahl and his K9 partner Loki arrived on the scene while other officers still were writing the Buick's driver a traffic ticket for dark window tint. Officer Westpfahl was partnered with Loki in 2018 after two years as a patrol officer with LCPD.[1] Upon being teamed, Officer Westpfahl and Loki attended McDonough K-9 in Blaine, Minnesota to be trained as a drug detection team. McDonough was where LCPD had sent other officers and canines for such training. The initial training class lasted 14 weeks. This training taught Loki to alert to the odors of cocaine (including cocaine base), heroin, methamphetamine, and marijuana (including hemp). With regard to marijuana and hemp, Loki will alert to both, although marijuana is illegal while hemp is not. Upon detecting one of these odors, Loki first exhibits a change in behavior, followed by a passive final response. Upon completing his training in December 2018, Loki met the requirements to be certified by the United States Police Canine Association, Inc. as a drug detection dog for the four listed substances. Since then, Loki has been tested and recertified every year. Loki's most recent recertification prior to the January 20, 2022 traffic stop had occurred on June 8, 2021. Officer Westpfahl and Loki train together at least 16 hours each month on drug detection and Loki's other law enforcement uses.

Officer Westpfahl tracks and analyzes Loki's drug detecting performance. *See* Gov. Exhs. 3A -3D. Since his deployment at the end of 2018, Loki has alerted to the odor of narcotics 215 times. In descending order, 33% of his alerts found drug paraphernalia, 20% found nothing, 17% found marijuana, 16% found methamphetamine, 8% found heroin, 2% found cocaine, 2%

---

[1] Before teaming with Officer Westpfahl, Loki had been trained in tracking and apprehending suspects. This training is irrelevant to Plancarte's motion to suppress.

the results were "not specified," 1% found MDMA, and 1% found prescription drugs. Cocaine base and CBD/ingestible marijuana are listed on Officer Westpfahl's pie chart (Exh. 3A) at 0%. Some of Loki's alerts found more than one type of controlled substance, but this breakout is not documented. Officer Westpfahl followed up on the "no evidence found" alerts and was able to substantiate 52% of them: he followed up with the drivers and passengers and learned information leading him to conclude that Loki had a valid basis for alerting. For the other 48%, Officer Westpfahl was unable to adduce information that would cause him to substantiate the accuracy of Loki's alert. Put another way, Loki had about a 90% confirmation rate on his alerts in the field. Historically, there was a five-in-six chance that he was not alerting to the odor of marijuana (or, theoretically hemp, although there is no indication that any of his alerts actually were for hemp).[2]

Back to the scene of the January 20, 2022 traffic stop: Officer Westpfahl commanded Loki to sniff the Buick. Loki's behavior changed as he approached the rear of the vehicle and he gave a positive alert at the trunk seam. From Inv. Mancuso's perspective, Loki's alert was one piece of his probable cause analysis:

> I also combined it with what I observed for the past two to three hours. It was very suspicious to me from being a drug investigator for nine years. . . . I didn't believe for one minute that I'd find CBD in the car.
>
> Tr., dkt. 31, at 21.

---

[2] There might be one hit on CBD oil out of 215 alerts, although this is not clear; if so, then this would constitute 0.46% of Loki's positive alerts.

Officers opened the trunk and recovered a backpack that contained the 10.9 pounds of methamphetamine charged against Plancarte in this prosecution. No marijuana, hemp, or CBD products were found in the car or on its occupants.

**(3) The Opinion of Michael Pennington, Defendant's Expert**

Plancarte, by counsel, has retained Michel Pennington as an expert witness on the use of drug detecting canines by law enforcement agencies. Pennington is the owner of Storm Dog Tactical in Ohio, a company that trains dogs to perform various law enforcement functions, including drug detection. Pennington previously served as a deputy sheriff in Franklin County, OH, including as a K9 officer from 2001-07. Pennington began his training as a K9 instructor part-time in 2002, full-time since 2007.

In recent years Pennington has become concerned that the legalization of CBD and hemp products has compromised the ability of trained drug detection dogs accurately to alert to substances that actually are controlled. This is because the dogs cannot differentiate between illegal marijuana, legal hemp, and legal CBD products: they will alert to all of them. Pennington has run tests at his company which showed that dogs trained to alert to marijuana also will alert to legal CBD oil. In Pennington's opinion, any drug-detecting dog that has been trained to alert to the odor of marijuana is useless in the field because its handler cannot rely on that dog to alert only to controlled substances. These dogs must be re-educated and trained off of the odor of marijuana, or they must be retired and replaced by dogs who never have been trained to alert to the odor of marijuana. According to Pennington, they cannot continue to work as drug detection dogs.

8

Therefore, opines Pennington, Loki's January 20, 2022 alert to the vehicle in which Plancarte was a passenger was unreliable. While complimentary of Loki's training and Officer Westpfahl's thoroughness as a handler, Pennington points out that Loki has not been certified to alert to the odor of marijuana *only* when the substance he is smelling has a THC content higher than 0.03%. Because Loki could not communicate to Officer Westpfahl *which* substance he was alerting to, Officer Westpfahl could not know whether Loki was smelling a controlled substance or was smelling a marijuana-related product that contained less than 0.03% THC. Therefore, continues Pennington, Loki's alert did not provide any information useful to the determination whether there was probable cause to search the Buick.

### (4) The Law Regarding Unlawful Marijuana

In its opposition brief, the government glosses the law regarding what constitutes unlawful marijuana. Under the federal Controlled Substances Act, marijuana, THC, and synthetic THC all are Schedule I controlled substances. 21 U.S.C. § 812(c). The Agricultural Improvement Act of 2018 altered the definition of the term marijuana under the CSA to exclude hemp grown pursuant to the 2018 Farm Bill Act. 21 U.S.C. § 802(16)(B)(I). Hemp is excluded from the definition of marijuana so long as its concentration of Delta-9 THC is ≤0.3% of the product's dry weight. 21 U.S.C. § 802(16)(B); 7 U.S.C. § 1639o(1).[3] There is no legal D9-THC threshold for synthetic derivatives of THC. A gray area is whether Delta-8 THC is legal; it probably is when it occurs naturally in hemp, but this is not clear. Wisconsin's definitions of

---

[3] Defense expert Pennington spoke of a 0.03% THC threshold and a 3% CBD oil concentration in his own tests. Neither percentage accurately captures the legal threshold, but the relevant point is that there is a legal threshold at all, not where it is set.

legal hemp mirror this federal scheme, then adds three more exceptions: THC dispensed or possessed for medical treatment is legal; THC contained in fiber from the stalks, oil or cake made from the seeds of cannabis plant incapable of germination; and drug products approved by the FDA that contain no more than 0.1% THC.

## ANALYSIS

If Daniel Burnham had been a criminal defense attorney, then he would have advised his peers to "File no little motions! They have no magic to stir the blood and probably will not themselves be realized. File big motions, aim high in hope and work, remembering that a noble, logical motion once submitted, will never die, but will assert itself with ever-growing insistency!"

Plancarte, by counsel, has filed such a motion. Alarmed that drug-detecting dogs with marijuana in their olfaction palate will alert to legal hemp and CBD products, Plancarte urges this court to declare their use completely and utterly unconstitutional, regardless of context or circumstance. That's not going to happen. Plancarte continues: because the unconstitutionality of these dogs is so obvious and so egregious, any officer who relies on their alert has knowingly and recklessly violated the Fourth Amendment. As a result, says Plancarte, this court must reject the government's claim that the police acted in good faith reliance on existing circuit law. That's not going to happen either.

Plancarte's position is extreme and unpersuasive, but his jeremiad raises a legitimate question: in what fashion should law enforcement agencies and courts account for the hemp-based Achilles' Heel in the efficacy of drug detecting dogs? Pennington, like a Buckeye

Cassandra, has been sounding this alarm for almost three years.[4] The gauntlet was thrown in academia not later than 2020,[5] but it has yet to be picked up in this circuit. It's time for the upper courts to weigh in on this issue. But, because they haven't yet, Plancarte is out of luck.

The law of this circuit is that "an alert from an adequately trained and reliable dog is sufficient to give rise to a finding of probable cause." *United States v. Bentley*, 795 F.3d 630, 635 (2015). *See also Illinois v. Caballes,* 543 U.S. 405, 409 (2005). The facts found above show that Loki was adequately trained and was reliable in the field: his 90% success rate is measurably better than the "back-of-the-pack" drug dog ("Rex") challenged in *Bentley*, whose 59% success rate was deemed good enough to support a finding of his reliability "and thus allow his alert to constitute a significant piece of evidence supporting the ultimate conclusion of probable cause." *Bentley,* 795 F.3d at 636. This being so, a defendant still has the right to dispute the reliability of the dog overall. *Id.* at 635 (quoting *Florida v. Harris*, 568 U.S. 237, 247-48 (2013)). "The question–similar to every inquiry into probable cause–is whether all the facts surrounding a dog's alert, viewed through the lense of common sense, would make a reasonably prudent person think

---

[4] Says Pennington,

> When the CBD and the hemp . . . come into play, I don't feel there was an honest look at the effect that this would have on the K-9 community within law enforcement. . . . What has occurred is they've pushed us and law enforcement to make a decision: either (1) try to remove marijuana from the dog's palate; (2) retire the dog and purchase a new one that isn't trained to detect marijuana; or (3) turn a blind eye and hope it doesn't get addressed.

Tr., dkt. 31, at 69.

[5] *See* Comment, "Beware of the Drug Detection Dog: The Fourth Amendment, Drug Detection Dogs, and State Legalization of Marijuana," 73 SMU L.R. 611 (Summer, 2020).

that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." *Florida v. Harris*, 568 U.S. at 248.

There are two ways to look at this. First, neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has held or implied that the 2018 federal statues regarding hemp or the various state laws legalizing the possession of THC in certain circumstances prohibit law enforcement agencies from relying on alerts by certified drug detecting dogs whose olfaction palate includes marijuana. As the government's survey of the law in its opposition brief demonstrates, no court has so ruled.

Plancarte points out that in *Caballes*, the Court distinguished dogs from thermal imaging devices because thermal imagers are capable of detecting lawful activity, while a dog sniff reveals no information other than the location of "a substance that no individual has any right to possess." 543 U.S. at 409-10 (distinguishing *Kyllo v. United States*, 533 U.S. 27 (2001)). Since this no longer is true, contends Plancarte, drug-sniffing dogs are anathemas to the Fourth Amendment, just like thermal imaging devices.[6] The government rejoins that the Court's concern in *Kyllo* was the revelation of intimate details in a home which the use of a drug dog during a roadside traffic stop could not possibly reveal, even if the dog has alerted to a coil of hemp rope.

As a matter of common sense and context, the government is correct, but this position doesn't squarely address the word choice actually employed by the Court in *Caballes*. On the other hand, Plancarte is propounding an extreme change in the law governing drug dog use that

---

[6] For what it's worth, this court ruled against thermal imaging before the Supreme Court did. *See United States v. Field*, 855 F. Supp. 1518 (W.D. Wis. 1994). This court still views thermal imaging as significantly more intrusive and alarming than canine drug sniffs during traffic stops.

defies logic and common sense. Circuit-level guidance is needed as to whether new lines need to be drawn, and if so, where to draw them. That's the point today: until this happens, no police department would have good reason to conclude that the legalization of hemp and some THC products requires them to completely stop using dogs trained on marijuana. Because the writing is on the wall, police departments oughtn't wait for a court ruling before they recalculate the value of these alerts, but they would have no reason to believe that their continued use of their dogs violates the Fourth Amendment *ipsa*. Plancarte's argument to the contrary is unpersuasive.

As a result, even if the Seventh Circuit ends up drawing lines that diminish–or even extinguish–the value of Loki's alert to the Buick, this would not augur suppression of the methamphetamine seized in this case. Courts generally do not suppress even *unlawfully* obtained evidence when the police acted on an objectively good-fath belief that their conduct was lawful at the time of their search. The question is whether a reasonably well-trained officer would have known that the search was illegal in light of binding appellate precedent. *United States v. Velazquez*, 906 F.3d 554, 560-61 (7th Cir. 2018) (citations omitted). Here, the LCPD and Officer Westpfahl employed Loki in exactly the manner allowed by circuit precedent. Any subsequent change in the law would not implicate their search of the Buick on January 20, 2022. This alone is a sufficient basis to deny Plancarte's motion to suppress.

The second way to approach Plancarte's motion is to determine whether the fact that Loki was trained to alert to marijuana actually *did* deprive the police of probable cause to search the Buick. This isn't exactly what the Court had in mind in *Davis,* quoted above, but in light of Plancarte's challenge, let's analyze the totality of circumstances known to the police that

afternoon. This involves penciling in some lines that ultimately will be the prerogative of the Seventh Circuit. *Cf. Burke v. Amedisys,* ___ F. Supp.3d ___, 2022 WL 3226797 at *13 (N.D. Ill., Aug. 10, 2022) ("when it comes to updating Seventh Circuit case law, the Seventh Circuit is in the driver's seat.").

Let's start with Loki: let's assume that because his olfaction palate includes marijuana, the police no longer can rely solely on his alert to provide probable cause for a car search. I have rejected Plancarte's view (endorsed by his expert, Pennington) that this requires LCPD to retire Loki, and I predict that this will be the Seventh Circuit's will reject this view as well. As the government notes, this is the approach that other courts have taken:

In *United States v. DeLuca,* 2022 WL 3451394 (10th Cir. 2022), the court held that even if hemp was on the dog's olfaction palate, "Maverick's alert on a car would still give rise to a high probability that a controlled substance is in the car as four of the five substances that Maverick could detect are illegal." *Id.* at *5. The court further noted that the defendant had presented no evidence and no argument about how common it is that hemp is found in a vehicle in the absence of other controlled substances. *Id.* at *5, n.5. Toward that end, in the instance case, the evidence shows that (1) Loki has never encountered hemp in the field and he might have alerted once to CBD oil; (2) during the two-month interdiction, the police had never encountered anyone possessing only hemp or legal CBD; and (3) in Inv. Mancuso's experience, not many of his cases have involved even unlawful marijuana, and usually it was encountered along with other controlled substances.

14

In *United States v. Hayes*, 2020 WL 4034309 (E.D. Tenn. 2020), the court noted in dicta that

> The Court is not persuaded by the Defendants' argument that the legalization of hemp eliminates any probable cause gained from a trained and certified drug detection dog's alert. . . . [T]he Court disagrees that federal courts must find that the legalization of hemp means that the odor of marijuana can no longer provide probable cause for a search.
>
> *Id.* at * 20 (citing *United States v. Vaughan*, 429 F. Supp. 3rd 499 (E.D. Tenn. 2019)).

To the same effect, the court in *State v. Walters*, 881, S.E. 2nd 730 (Ct. App. 2022), noted that notwithstanding North Carolina's legalization of hemp, "the scent of marijuana or hemp in addition to other facts may grant an officer probable cause to search for or seize suspected contraband." *Id.* at 739.

This leads to the other evidence that supported Inv. Mancuso's decision to stop and search the Buick. Inv. Mancuso had developed a great deal of relevant information about the Buick and its occupants that led him to believe that he was watching an ongoing drug transaction, even before Loki was called into action. Notwithstanding Plancarte's dismissive gloss of what Inv. Mancuso actually had seen, it long has been the law that police are entitled to draw conclusions that criminal activity is afoot based on their training and experience. *United States v. Zamudio*, 909 F.3d 172, 176 (7th Cir. 2018); *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018); *United States v. Carillon*, 269 F.3d 761, 766-67 (7th Cir. 2001).

It started with the driver's reaction to seeing a state trooper on the interstate while driving to La Crosse from a methamphetamine source metropolitan area, and it continued with the Buick's entry into a drug zone so notorious that it was under a two-month drug interdiction

15

operation. Next were the unusual and repeated stop-and-wait maneuvers that were illogical on their face but consistent with a drug courier looking for, then waiting for his contact. It concluded with Emanuel Florez's inconsistent answers and unusual nervousness during the traffic stop. All of these circumstances supported Inv. Mancuso's conclusion, based on his years of training and experience, that the occupants of the Buick probably were engaged in drug dealing.

The fact that Loki then alerted to the car sufficed to provide probable cause, even if this court discounts its value to account for the slim possibility that he might be alerting to hemp or CBD oil. Given Inv. Mancuso's in-the-field experience–namely, having never encountered hemp or CBD in this situation–the likelihood that in this case, on these facts, Loki was alerting to a *legal* substance were infinitesimal. "Probable cause exists when, based on the totality of circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Ochoa-Lopez*, 31 F. 4th 1024, 1026-27 (7th Cir. 2022). Probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts; the relevant inquiry is the degree of suspicion that attaches to particular types of noncriminal acts. *District of Columbia v. Wesby*, ___ U.S. ___, 138 S.Ct. 577, 588 (2018). *See also United States v. Gary*, 790 F.3d 704, 708 (7th Cir. 2015) (probable cause exists when the inference of illegal conduct by trained and experienced officers is at least as probable as any innocent inference) (quoting *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003)).

Finally, a word about Plancarte's repeated allegations of bad faith by the police. An argument this strident, on these facts, borders on vexatious. Suppression of evidence is not a Fourth Amendment right, nor a remedy for a Fourth Amendment violation. *United States v.*

*Davis*, 44 F. 4th 685, 689 (7th Cir. 2022) (citing *Davis v. United States*, 564 U.S. 229, 236 (2011)).  Courts employ the exclusionary rule to deter intentional conduct that was patently unconstitutional, wanton, and purposeful.  *Id.* (citing *Herring v. United States*, 555 U.S. 135, 1343 (2009) and *Brown v. Illinois*, 422 U.S. 590, 602-03 (1975)).  It is one thing for Plancarte to point out the need to modify existing precedent, it is something else to accuse the police of intentional misconduct on the ground that they did not comport their behavior to what Plancarte thinks the law ought to be.

## RECOMMENDATION

Pursuant to 42 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny defendant Juventino Lara Plancarte's motion to suppress evidence.

Entered this 10th day of February, 2023.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

120 N. Henry Street, Rm. 540
Madison, Wisconsin 53703

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

February 10, 2023

Robert Anderson
Assistant United States Attorney
222 West Washington Avenue, Ste. 700
Madison, WI 53703

Alexander Vlisides
Federal Defender Services of Wisconsin
22 East Mifflin St., Ste. 1000
Madison, WI 53703

      Re:    United States v. Juventino Lara Plancarte
             Case No. 22-cr-64-wmc

Dear Counsel:

      The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

      The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

      In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before February 24, 2023, by filing a memorandum with the court with a copy to opposing counsel.

      If no memorandum is received by February 24, 2023, the court will proceed to consider the magistrate judge's Report and Recommendation.

      Sincerely,

      /s/

      Connie A. Korth
      Secretary to Magistrate Judge Crocker

Enclosures

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:
        (1) injunctive relief;
        (2) judgment on the pleadings;
        (3) summary judgment;
        (4) to dismiss or quash an indictment or information;
        (5) to suppress evidence in a criminal case;
        (6) to dismiss or to permit maintenance of a class action;
        (7) to dismiss for failure to state a claim upon which relief can be granted;
        (8) to dismiss actions involuntarily; and
        (9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).